| JOAN BERNARD ARMSTRONG, Chief Judge.
New Orleans Brass (NOB)[1] devolutively appeals a decision of the Office of Work *540 ers’ Compensation Administration in favor of its employee, Jeff Lazaro, finding that Mr. Lazaro proved he was permanently disabled from returning to his former job duties as a professional hockey player as of February 8, 2003 and ordering NOB to pay Supplemental Earnings Benefits (SEB) from that date.
Mr. Lazaro answered the appeal seeking SEB from the date of his injury, January 3, 2002, with credit for salary paid by the NOB during his disability, for penalties and for attorney’s fees up to a $2000 maximum for NOB’s failure to pay his medical bill, and for penalties and attorney fees of $100 per day up to a $3,000 maximum for NOB’s' alleged failure to satisfy the judgment.
On June 10, 2002, Mr. Lazaro through counsel filed a Disputed Claim for Compensation, Form 1008 in the New Orleans Office of Workers’ Compensation. L NOB and its insurer acknowlédged receipt of the claim and accepted service on September 4, 2002 and filed a general denial asserting their statutory rights on September 9, 2002. The matter was tried to the compensation judge on July 28, 2003.
The trial court specifically found Mr. Lazaro to be a ‘Very credible witness”. Mr. Lazaro testified that he currently is an insurance representative employed by Cornerstone of America, selling health benefits for self-employed small business owners and college students for Midwest National Life Insurance Company of Tennessee.
He testified that he graduated from the University of New Hampshire on a hockey scholarship with a major in communications. Upon graduation in 1990, he was signed by the Boston Bruins hockey, team, and was traded to the Ottawa Senators. He played on the United States Olympic Hockey team and was selected alternate captain in 1994. He then signed with a team in Austria for one year and in Germany for three years.
Upon his mother’s death, he returned to the United States and was employed by the NOB in 1997 as a player/assistant coach. He testified on cross-examination that although the title of his position was “player/assistant coach”, he actually had no coaching duties, and that the position was created in order to enhance his salary without impinging upon salary cap requirements.
While playing for the NOB he was twice chosen to be on the East Coast Hockey League’s All Star Team. He played for the NOB for five years, when he |3suffered an injury to his left knee that ended his career. At the time of his injury, he was earning $45,000 annually plus rent, cable television and utilities. He also received $35 per day when living on the road for the 36 annual “away” hockey games.
Mr. Lazaro testified that in March of 2001 he hurt his knee while playing hockey for the NOB. Physicians stabilized the bruising with ice and physical and massage therapy, and after a month he was able to *541 return to hockey. His knee continued to swell and trouble him, and he ultimately underwent surgery by Dr. Deryk Jones, an NOB team physician, in March of 2001. He underwent surgery the next month. After eight months of rehabilitation he was released on December 12, 2001 to return to play. He attempted to do so, but on January 3, 2002 his knee was reinjured and Dr. Jones again treated him. About 44 ccs. of fluid were drained from his knee. After further treatment, Dr. Jones cleared him on March 12, 2002 to attempt to return to the hockey rink. However, after one unsuccessful attempt on March 13, 2002 to return to skating, Mr. Lazaro was unable to continue to play hockey. He underwent another surgery on June 13, 2002. He testified that he saw Dr. Jones on February 8, 2003, and, at that visit, the doctor found that Mr. Lazaro was disabled from playing professional hockey.
When it became evident that he would not be able to return to his hockey career, the NOB suggested that he retire so that he would not be cut from the team. Dr. Jones was still following his case, and agreed that he should retire from professional hockey.
|4Mr. Lazaro testified that NOB had “talked about” his taking a position as an assistant coach in the East Coast Hockey League, paying approximately $20,000 annually, plus housing, a car and a gas card. The trial court found that the regulations of the hockey league prohibited Mr. Lazaro from being both a player and an assistant coach. Therefore, Mr. Lazaro resigned on March 13, 2003 in order that he could take a modified duty job as an assistant coach. However, NOB did not offer him such a position, presumably because his physical condition would not allow him to demonstrate hockey skills to the players. This testimony supports the trial court’s finding that no written contract for Mr. Lazaro to be employed as an assistant coach was ever executed, that Mr. Lazaro never actually became an assistant coach and that he could not perform all the duties of that job, which required skating. The trial court found clear evidence of the NOB’s intent and of Mr. Lazaro’s intent that he would resign as a player only to take a position as a coach. The court noted that NOB continued to pay Mr. Lazaro’s salary as a professional hockey player. The court found that NOB offered Mr. Lazaro a job as an assistant coach with modified duties, recognizing Mr. Lazaro’s skating limitations. The potential job as an assistant coach expired when the NOB ceased to exist after the hockey playoffs.
In its reasons for judgment, the trial court specifically found that it believed Mr. Lazaro’s statements as to the reason for his retirement and his testimony concerning the assistant coach position. The record amply supports this finding. While the court found that Mr. Lazaro did not prove that he was unable to return to | Bhis former job as a professional hockey player as of March 13, 2002, when Dr. Jones released him on March 12, 2002, it found that he was so disabled as of February 8, 2003.
Mr. Lazaro offered Dr. Jones’ deposition, taken on July 24, 2003. Dr. Jones served as NOB’s team physician and as Mr. Lazaro’s treating physician. His medical background included an undergraduate degree from Emory University, a medical degree from Stanford Medical School, chief residency at Harvard University, fellowship at the University of Pittsburgh and board certification in orthopedic surgery.
Dr. Jones testified that prior to the injury in question, he had performed a left knee lateral meniscectomy on Mr. Lazaro and had released him to attempt to return to play when the subject injury occurred. *542 In his deposition, he reviewed Mr. Lazaro’s MRI and testified that it showed a large tear of the lateral meniscus, the outside part of Mr. Lazaro’s knee. On April 11, 2001, Dr. Jones performed the usual treatment, an attempt to repair the meniscus, to suture it back together. He took out about 20% of the posterior part of the meniscus and put some sutures across the portion he felt could be repaired on the outside part of the meniscus. This repair apparently failed when Mr. Lazaro suffered his January 3, 2002 injury.
Dr. Jones saw Mr. Lazaro on March 12, 2002. Mr. Lazaro reported that he had been able to skate for the past two days. Dr. Jones examined Mr. Lazaro and noted that he had a full range of motion, no left knee swelling, no significant joint line tenderness and that the cystic area was well healed with no sign of | ^reformation. He released Mr. Lazaro to return to hockey play with the use of a J-sleeve support for his knee.
On June 12, 2002 he saw Mr. Lazaro who had complained of an increase in pain and swelling in his knee. Dr. Jones felt he had some fluid developing on the outside part of the knee. He testified that sometimes these types of repairs could be sutured back together and would heal. In this case, he felt the symptoms were consistent with a failure to heal. As a result of the swelling, he performed another surgery on June 13, 2002 to remove the torn portion that had been sutured back together. Dr.. Jones testified that he performed a large meniscectomy and a lot of the tissue was removed.
Dr. Jones testified that he last saw Mr. Lazaro on February 18, 2003 and found that he did not have enough strength to allow him to perform at the level he had been performing for the NOB, and determined that while he could perform daily activities, he could not play or skate at a professional level. He agreed that after the January 2002 injury and the June 2002 surgery, Mr. Lazaro was disabled from performing as a professional hockey player.
Mr. Lazaro identified his earnings from the insurance business, and testified that he would be entitled to 65 to 70 percent of the gross figure of between $9000 and $10,000 during his employment of less than a year.' On cross-examination, he testified that he received $700 for work he performed, including roller-skating, at a summer hockey camp. He did no other work after having left the NOB.
l7He identified a bill from Tulane Medical Center in the amount of $266.80 and testified that although he personally took the bill to the general manager at the NOB office and repeatedly asked that it be paid, it has not been paid to date. NOB sent the bill to Mr. Lazaro’s home and asked him to pay it. The trial court found that NOB must pay this unpaid accident-related medical bill. The NOB offered no justification for its refusal to pay this bill.
Mr. Lazaro testified to his earning as an NOB player, consisting of $45,000 in salary, $9,360 in rent, utilities and cable television, and $1,260 for his $35 per diem for the thirty-six “away” games played each year. The total salary for SEB purposes is $55,620. The gross total of commissions and advances he received for the first three quarters of the year following his retirement totaled $11,988.05, and net commissions were $8,391.63. His estimated fourth quarter income was $2,097.90, for a total postrinjury annual income of $10,489.53 plus $700 for his work at summer hockey camp. The trial court awarded SEB based on the actual net amount of Mr. Lazaro’s Cornerstone commissions and income as it will be reported on Compensation Form 1021.
*543 The NOB filed a motion to amend the judgment to award SEB based on Mr. Lazaro’s gross Cornerstone earnings. Mr. Lazaro filed a cross-motion to amend the judgment and, alternatively, for a new trial. Mr. Lazaro contended that he was disabled from the date of his injury, January 3, 2002. While admitting that there may be evidence excusing the NOB from liability for penalties and attorney fees, Mr. Lazaro also claimed entitlement to SEB from April 1, 2002, the last date.on 1 swhich he received any payment from the NOB. The trial court denied Mr. Lazaro’s motion as not timely filed, and granted the NOB’s motion for a devolutive appeal on November 25, 2003.[2]
NOB assigns as error the award of SEB from February 8, 2003, claiming that Mr. Lazaro was released to full duty by his doctor and voluntarily resigned from his employment. The determination by a workers’ compensation judge as to whether the claimant’s testimony is credible and whether the claimant has discharged his burden of proof of a work-related accident and a resulting injury are factual determinations that will not be disturbed upon review in the absence of manifest error or unless clearly wrong. Kemp v. East Baton Rouge City Parish, 2002-2083 (La.App. 1 Cir. 6/27/03), 858 So.2d 537. The manifest error standard applies to the compensation judge’s great discretion in awarding penalties and attorney fees as well. Atwood v. Ewing Timber, Inc., 36,732 (La.App. 2 Cir. 1/29/03), 836 So.2d 1199, writ denied, 2003-0888 (La.5/16/03), 843 So.2d 1134.
In order to recover SEB, Mr. Lazaro must prove by a preponderance of evidence that he is unable to earn ninety percent or more of his pre-injury wages. Freeman v. Poulan/Weed Eater, 93-1530, p. 7 (La.1/14/94), 630 So.2d 733, 739. It is NOB’s position that because Dr. Jones cleared Mr. Lazaro on March 12, 2002 to return to play hockey, and Mr. Lazaro signed an acknowledgment of such clearance, Mr. Lazaro was not entitled to SEB.
|9The NOB relies on La.R.S. 23:1221(3)(e)(i), which provides that if the employee is not engaged in any employment. or self-employment, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and which he was offered or tendered by the employer or any other employer. The NOB contends that since Mr. Lazaro was released in March of 2002 to play hockey and the NOB offered to allow him to continue to do so, he cannot claim SEB. However, La.R.S. 23:1221(3)(c)(ii) provides:
For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
We find that the trial court was not clearly wrong or manifestly erroneous in finding that Mr. Lazaro’s own testimony *544 provided sufficient clear and convincing evidence that he could not perform his duties as a professional hockey player without substantial pain. There is simply no credible evidence that Mr. Lazaro could play professional level hockey without substantial pain after his January 2002 injury. Although the doctor cleared him to return to play on March 12, 2002, Mr. Lazaro testified without contradiction that his attempt to do so on the next day |10was totally unsuccessful, and he was unable to play hockey from and after the January 2002 injury.
Mr. Lazaro contends that his SEB should have been awarded from January 3, 2002, the date of his injury, with credit for contractual salary payments made by NOB through April 1, 2002.
The trial court found that Mr. Lazaro proved only that he was disabled from playing professional hockey from his February 8, 2003 office visit to Dr. Jones. However, the evidence is clear and uncon-troverted that he was injured on January 3, 2002, was treated by the team physician and released to try to return to the hockey rink on March 12, 2002, but his attempt to do so on March 13, 2002 failed. The record evidence is manifestly clear that Mr. Lazaro was unable to play hockey from and after January 3, 2002, and is entitled to SEB from that date, subject to a credit for all contractual or other payments made by the NOB following January 3, 2002 through April 1, 2002.
Mr. Lazaro established that he was unable to play hockey at a professional level and/or without substantial pain from and after January 3, 2002. The fact that he could be offered such a job with the NOB or with another team does not controvert the evidence that he would be unable to perform adequately and without substantial pain. Therefore, Banks v. Industrial Roofing & Sheet Metal Works, 96-2840 (La.7/1/97), 696 So.2d 551, cited by the NOB, does not support its position under the particular facts presented by the instant case. The requirement that Mr. Lazaro present regular reports of his actual earnings in order to calculate his |! entitlement to SEB protects the NOB from exposure should he become able to earn income at the pre-injury level.
Mr. Lazaro claims he should have been awarded penalties for denial of the payment of his July 13, 2002 medical bill from Tulane University at the rate of $50 per day up to the maximum of $2,000 pursuant to La.R.S. 23:1201(F).
The trial court specifically found that the NOB reasonably controverted Mr. Lazaro’s claims, and, therefore, assessed no attorney fees or penalties. The mere fact that an employer refuses to pay and denies liability is insufficient to warrant imposition of penalties although the facts and law developed at trial show that he was in error in refusing. Unless the refusal had no reasonable foundation in fact, there is no ground for imposition of penalties. See Dean v. K-Mart Corp., 1997-2850 (La.App. 4 Cir. 7/29/98), 720 So.2d 349. The evidence of record supports the trial court’s holding insofar as it relates to the reasonableness of the NOB’s resisting Mr. Lazaro’s claim for SEB. However, our review of the record in its entirety discloses that the NOB has not presented any basis on which it would be justified in refusing to pay the Tulane bill. There is simply no evidence in the record to support the trial court’s finding that the NOB was justified in resisting Mr. Lazaro’s claim for reimbursement of the $266.80 medical bill. Mr. Lazaro testified that he presented his bill repeatedly to the NOB’s general manager to no avail, thus satisfying the notice requirement of La.R.S. 23:1201(E). Mr. Lazaro is therefore entitled to assessment of a penalty in an *545 amount equal to 12% of the unpaid medical bill or $50 per calendar day, whichever is greater ($50 per day in |12this case), for each day in which any or all of the medical bill remains unpaid, together with reasonable attorney fees for each disputed claim, not to exceed an aggregate maximum of $2,000. La.R.S. 23:1201(F). We remand this matter to the trial court for determination of penalties and attorney fees to which the plaintiff may be entitled.
Mr. Lazaro claims that he is entitled to an award pursuant to La.R.S. 23:1201(G) of $100 per day up to a maximum of $3,000 and for reasonable attorney’s fees for each calendar day after thirty days that the judgment of August 26, 2003 remains unpaid. Mr. Lazaro’s claim is based upon the fact that NOB’s devolu-tive appeal did not suspend the effect of the judgment from which NOB appealed. However, the statute applies by its own terms only to “final, nonappealable judgment[s]”. The statutory provision would apply, for example, to consent judgments that cannot be appealed or to judgments entered into following binding, non-appeal-able arbitration. Since the judgment in the instant case has been appealed, this provision is inapplicable and Mr. Lazaro is not entitled to the penalties and attorney fees provided for by the statute.
For the foregoing reasons, we amend the judgment to provide that Mr. Lazaro be paid SEB on his net income as shown on regularly scheduled statements on Form 1021 from April 1, 2002. We remand for the determination of penalties and attorney fees. In all other respects, we affirm the judgment.
JUDGMENT AMENDED IN PART AND, AS AMENDED, AFFIRMED, AND REMANDED.

. While the appeal is filed on behalf of the NOB, counsel points out in brief that NOB ceased to exist after the 2002 hockey season. NOB’s defense was perpetuated through its *540 workers' compensation insurer, Villanova Insurance Company, and the claims adjusting services of a third party administrator, GAB Robins. Upon receipt of the court’s order denying modification of judgment and submission of requests for payment of the judgment, it was learned that Villanova was placed into receivership by a Pennsylvania court in July of 2003, was deemed insolvent and is being liquidated in accordance with the terms of a Pennsylvania liquidation order. In December of 2003 it was learned that a claim would have to be made with the Louisiana Insurance Guaranty Association (LIGA) to perpetuate the defense and appeal or to satisfy the Judgment against the defunct NOB and insolvent compensation insurer. The substitution of LIGA for the insolvent insurer does not appear in the record, but is adverted to in appellant's brief.

. Mr. Lazaro filed and moved to dismiss his motion, for a devolutive appeal, reserving his right to answer the NOB's appeal. The trial court denied the motion to modify judgment, noting that counsel for the parties had agreed to modify the judgment and to submit it in written, signed form, but that counsel had failed to agree to the modification.